

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-19-00405-CV
_____

**ROBERT L. MALCOM, APPELLANT**

**V.**

**COBRA ACQUISITIONS, LLC, APPELLEE**

On Appeal from the 242nd District Court
Hale County, Texas
Trial Court No. B42941-1909; Honorable Kregg Hukill, Presiding

April 30, 2020

## MEMORANDUM OPINION

Before PIRTLE, PARKER, and DOSS, JJ.

Appellant, Robert L. Malcom, sold his business to Appellee, Cobra Acquisitions, LLC, and the parties entered into two agreements containing restrictive covenants. Cobra accused Malcom of violating the restrictive covenants and filed suit for breach of contract. In the interim, the trial court granted a temporary injunction against Malcom for violating

certain non-competition provisions.  By six issues, Malcom challenges the temporary injunction.  The Table of Contents of Malcom's brief lists six issues as follows:

1. Whether the trial court abused its discretion in granting an application for temporary injunction when there was no showing of probable injury.

2. Whether the trial court abused its discretion in granting an application for a temporary injunction when there was no showing of a lack of an adequate remedy at law.

3. Whether the trial court abused its discretion in granting an application for temporary injunction when there was no showing of a likelihood of success on the merits.

4. Whether the trial court abused its discretion in admitting the affidavit of Cory Mahan, over the objection of [Malcom].

5. Whether the trial court abused its discretion by failing to reform unreasonable terms of the covenant not to compete pursuant to Sec. 15.51 of the Texas Business and Commerce Code.

6. Whether dissolution of the temporary injunction is necessary as injunctive relief is governed by principles of equity, which require a balancing of the equities.

The issues presented in the body of Malcom's brief, which do not comport with the issues presented above, provide as follows:[1]

I.      STANDARDS OF REVIEW

II.     THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING THE TEMPORARY INJUNCTION ABSENT SUFFICIENT EVIDENCE OF A PROBABLE RIGHT OF RECOVERY.

III.    THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING THE TEMPORARY INJUNCTION ABSENT SUFFICIENT EVIDENCE OF IRREPARABLE INJURY AND LACK OF ADEQUATE LEGAL REMEDY.

---

[1] There is no issue four in the body of the brief dedicated to Malcom's complaint regarding admission of Cory Mahan's affidavit.  Instead, under issue II, Malcom commingles his argument that Mahan's affidavit is conclusory and then presumes the trial court improperly considered it with his argument on a probable right of recovery.

V.      THE NON-COMPETITION AGREEMENT AND THE RESULTING TEMPORARY INJUNCTION ARE BOTH UNENFORCEABLE BECAUSE THEY ARE VAGUE AND OVERLY BROAD AND NOT SPECIFIC IN THEIR TERMS.

VI.     DISSOLUTION OF THE TEMPORARY INJUNCTION IS NECESSARY AS INJUNCTIVE RELIEF IS GOVERNED BY PRINCIPLES OF EQUITY, WHICH REQUIRE A BALANCING OF THE EQUITIES.

For the reasons that follow, we affirm the trial court's *Temporary Injunction*.

### BACKGROUND

Prior to the events at issue in this controversy, Malcom worked at Xcel Energy and was also a spiritual director at a halfway house for men. In 2012, he decided to leave his position at Xcel in order to establish Higher Power Electrical, LLC, a limited liability corporation, launched to train the residents of the halfway house in a trade that would help them find gainful employment. The enterprise grew into a power distribution network that was in the business of building, maintaining, and repairing transmission and distribution lines and substations for investor-owned utilities (IOU).[2] Its territories included Texas, New Mexico, Oklahoma, and other southern states. Five years after its inception, the business employed ten to twelve crews.

In 2017, Keith Ellison,[3] then President of Cobra approached Malcom about purchasing Higher Power for $4,000,000.[4] After negotiations, Malcom agreed to sell his business to Cobra and, because of the good will that Malcom had developed, Cobra

---

[2] IOUs are publicly traded companies unlike cooperatives.

[3] Ellison was eventually indicted for corruption for unfairly soliciting federal government contracts in Puerto Rico during the hurricane recovery effort.

[4] During his testimony Malcom insisted the sales price was $5,000,000 but section 2.02(a) of the *Purchase Agreement* recites the purchase price as $4,000,000 minus the escrow amount of $750,000.

agreed to keep him as president for a three-year transition period. On April 21, 2017, Malcom and Cobra signed a *Purchase Agreement* containing the details of the sale. That same date, the parties entered into an *Employment Agreement* whereby Cobra employed Malcom as president for the transition period. Malcom's annual base salary was set at $200,000 plus potential bonuses.

Pursuant to the terms of the *Purchase Agreement*, Malcom was prohibited from working for competitors in Texas, New Mexico, and Oklahoma. He was also prohibited from soliciting Higher Power's customers and employees until two years following his termination from employment (known as the "restricted period" in the *Employment Agreement*).

The relevant provisions of the *Purchase Agreement* are as follows:

**Section 5.02 Non-competition; Non-solicitation**

(a) During the Restricted Period . . . Seller shall not . . . engage in or assist others in engaging in the Company Business or any division or business segment of any Company Business . . . or intentionally interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between the Company or its Affiliates and customers or suppliers of the Company or its Affiliates or cause, induce or encourage any material actual or prospective client, customer, supplier or licensor of the Company or its Affiliates (including any existing or former client or customer of the Company or its Affiliates during the Restricted Period), or any other Person who has a material business relationship with the Company or its Affiliates, to terminate or modify any such actual or prospective relationship.

(b) During the Restricted Period, Seller shall not, and shall not permit any of his respective Affiliates to, directly hire or solicit any employee of the Company or encourage any such employee to leave such employment or hire any such employee who has left such employment.

(c) During the Restricted Period, Seller shall not, and shall not permit any of his respective Affiliates to, directly solicit or entice, or attempt to solicit or entice, any clients or customers of the Company or potential clients or customers of the Company for purposes of diverting their business or services from the Company.

(d) Seller acknowledges that a breach or threatened breach of this Section 5.02 would give rise to irreparable harm to Buyer, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by Seller of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief . . . .

(e) Seller acknowledges that the restrictions contained in this Section 5.02 are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. . . .

The *Purchase Agreement* also included several disclosure schedules. Disclosure Schedule 3.09(a) provided in part as follows:

## Material Contracts

### (i) Contracts with Material Customers and Material Suppliers

### Material Customers

1. Xcel Energy
2. AEP
3. Lea County

The *Employment Agreement* contained language similar to the restrictions in the *Purchase Agreement* including the following provision:

### 6. Restrictive Covenants

(c) In light of Employee's access to Confidential Information and position of trust and confidence with the Company, Employee hereby agrees that, during his employment and for a period of two (2) years following such

termination (the "Restricted Period"), Employee shall not, and shall not permit any of his Affiliates to, directly or indirectly, in the Territory (defined below): engage in or assist others in engaging in the business of any Restricted Business (defined below) or any division or business segment of any Restricted Business, have an interest in any Restricted Business or any division or business segment of any Restricted Business in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant, or intentionally interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between the Company or its Affiliates and customers or suppliers of the Company or its Affiliates or cause, induce or encourage any material actual or prospective client, customer, supplier or licensor of the Company or its Affiliates and any Person that becomes a client or customer of the Company or its Affiliates during the Restricted Period), or any other Person who has a material business relationship with the Company or its Affiliates, to terminate or modify any such relationship. For purposes of this Agreement:

(i) "**Affiliates**" of a Person means any other person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

(ii) "**Person**" means an individual, corporation, partnership, joint venture, limited liability company, governmental authority, unincorporated organization, trust, association or other entity.

(iii) "**Restricted Business**" means the business of servicing investor-owned utilities, including providing services to the oil and gas industry.

(iv) "**Territory**" means the State of Texas, the State of New Mexico and the State of Oklahoma.

Malcom did not complete his three-year employment transition period after the sale of Higher Power. Instead, on October 13, 2018, he resigned as president and was succeeded by Cory Mahan. After resigning, Malcom performed a "low voltage job" for his father-in-law and, in February 2019, still in the time frame of the restricted period of two years following his resignation, Malcom was recruited by Max Wolford to work for BHI Energy, a direct competitor of Higher Power that engaged in servicing IOUs. Malcom

advised BHI that he remained under restrictive covenants until October 2020, and the decision was made to hire him as vice president of operations for territories east of the Mississippi River to avoid the territories of Texas, New Mexico, and Oklahoma. Wolford served as vice president of operations west of the Mississippi River which included Texas, New Mexico, and Oklahoma.

Higher Power interpreted Malcom's duties at BHI as a breach of the restrictive covenants in the *Purchase Agreement* and *Employment Agreement*. Specifically, Higher Power alleged that Malcom hired at least six crews away from Higher Power and caused two of Higher Power's customers (Otero County Electric Cooperative, Inc. and Lea County Electric Cooperative, Inc.) to transfer their businesses to BHI.

On September 16, 2019, Cobra filed suit against Malcom seeking declaratory relief, including a temporary injunction against Malcom for violating certain provisions of the *Purchase Agreement* and the *Employment Agreement*. The cause of action alleged in the underlying suit is a breach of contract claim. By its pleading, verified by Mahan, Cobra alleged that Malcom engaged in a "competing business" and caused employees of Higher Power to terminate or modify their employment. That same day, the trial court issued a temporary restraining order.

One month later, the trial court held a hearing to determine whether to grant a temporary injunction. After the hearing, the trial court granted a temporary injunction enjoining Malcom from (1) engaging in company business in Texas, New Mexico, and Oklahoma, including work for Otero and Lea County as they were former clients of Higher Power, (2) soliciting and hiring Higher Power's current or former employees, and (3)

soliciting, contacting, enticing, or attempting to solicit or entice Higher Power's clients or customers in Texas, New Mexico, and Oklahoma. Following the trial court's ruling, Malcom requested findings of fact and conclusions of law, but none were filed. Pursuant to section 51.014(a)(4) of the Texas Civil Practice and Remedies Code, Malcom filed this interlocutory appeal.[5] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(4) (West Supp. 2019).

### STANDARD OF REVIEW

The decision to grant or deny a temporary injunction is within the sound discretion of the trial court. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). Therefore, we review a trial court's order granting a temporary injunction for clear abuse of discretion. *Henry v. Cox*, 520 S.W.3d 28, 33 (Tex. 2017). In that process, we limit the scope of our review to the validity of the order, without reviewing or deciding the underlying merits, and we will not disturb the order unless it is "so arbitrary that it exceed[s] the bounds of reasonable discretion." *Id.* at 33-34 (quoting *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (op. on reh'g)). No abuse of discretion exists if some evidence reasonably supports the trial court's ruling. *Henry*, 520 S.W.3d at 34; *Butnaru*, 84 S.W.3d at 211. Further, the trial court does not abuse its discretion when it makes a decision based on conflicting evidence. *Loye v. Travelhost*, *Inc.*, 156 S.W.3d 615, 619 (Tex. App.—Dallas 2004, no pet.). In our review, we draw all legitimate inferences from the evidence in the light most favorable to the decision and review any legal determinations *de novo*. *Id.* We do not resolve factual disputes, *Bright Land & Cattle*, *LLC v. PG-M Int'l*, *LLC*, No. 07-16-00336-CV, 2017 Tex. App. LEXIS 2083, at *6 (Tex. App.—Amarillo March

---

[5] Trial on the merits was scheduled for December 18, 2019, but was vacated pending this appeal.

8

9, 2017, no pet.) (mem. op.), and where, as here, no findings of fact or conclusions of law are filed, the trial court's determination of whether to grant or deny a temporary injunction "must be upheld on any legal theory supported by the record." *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978); *Tom James of Dallas, Inc. v. Cobb*, 109 S.W.3d 877, 884 (Tex. App.—Dallas 2003, no pet.).

In a temporary injunction hearing the trial court, as factfinder, judges the credibility of the witnesses and assigns what weight it chooses to their testimony. *S. Plains SNO, Inc. v. Eskimo Hut Worldwide, Ltd.*, No. 07-19-00003-CV, 2019 Tex. App. LEXIS 3015, at *13 (Tex. App.—Amarillo April 12, 2019, no pet.) (mem. op.) (citations omitted). Accordingly, we are bound to view the evidence in the light most favorable to the trial court's decision. *Bright Land & Cattle*, 2017 Tex. App. LEXIS 2083, at *6.

### APPLICABLE LAW

A temporary injunction is an extraordinary remedy granted to preserve the status quo pending a trial on the merits. *Butnaru*, 84 S.W.3d at 204. An applicant seeking relief must plead and prove the three specific elements: (1) a cause of action against the defendant, (2) a probable right to the relief sought on that cause of action, and (3) a probable, imminent, and irreparable injury in the interim if the injunction is not granted. *Id.*

A probable right of recovery is proven by alleging the existence of a right and presenting evidence tending to illustrate that the right is being denied. *Friona Indep. Sch. Dist. v. King*, 15 S.W.3d 653, 657 (Tex. App.—Amarillo 2000, no pet.). The movant for a temporary injunction is not required to prove ultimate success on its cause of action.

9

*Bright Land & Cattle, LLC*, 2017 Tex. App. LEXIS 2083, at *5. A movant "must show only a likelihood of success on the merits." *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 686 (Tex. 1990). The movant's burden is met simply by alleging a cause of action and presenting evidence tending to sustain it. *Bright Land & Cattle, LLC*, 2017 Tex. App. LEXIS 2083, at *5.

The movant for a temporary injunction must establish that it is threatened with an actual irreparable injury if the injunction is not granted. *See, e.g., Marketshare Telecom, L.L.C. v. Ericsson, Inc.*, 198 S.W.3d 908, 925 (Tex. App.—Dallas 2006, no pet.) (citing *Markel v. World Flight, Inc.*, 938 S.W.2d 74, 80 (Tex. App.—San Antonio 1996, no pet.)). "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. "[A] legal remedy is inadequate if, among other things, damages are difficult to calculate or their award may come too late." *SHA, LLC v. Northwest Tex. Healthcare Sys.*, No. 07-13-00320-CV, 2014 Tex. App. LEXIS 38, at *3 (Tex. App.—Amarillo Jan. 3, 2014, no pet.) (mem. op.).

However, when a temporary injunction is sought to enforce a restrictive covenant, the party seeking the injunction is not required to prove irreparable injury for which there is no adequate remedy at law. *See Letkeman v. Reyes*, 299 S.W.3d 482, 486 (Tex. App.—Amarillo 2009, no pet.) (citing *Jim Rutherford Investments, Inc. v. Terrarmar Beach Community Ass'n*, 25 S.W.3d 845, 849 (Tex. App.—Houston [14th Dist.] 2000, pet. denied)). *See also Munson v. Milton*, 948 S.W.2d 813, 815 (Tex. App.—San Antonio 1997, pet. denied). Instead, all that is required is proof that the defendant intends to commit an act that would breach the restrictive covenant. *Letkeman*, 299 S.W.3d at 486.

**CORY MAHAN'S AFFIDAVIT**

Before addressing the issues related to the *Temporary Injunction*, we address the issue of Mahan's affidavit in support of Cobra's pleading. Rule 682 of the Texas Rules of Civil Procedure requires a sworn petition for injunction to be verified by affidavit. TEX. R. CIV. P. 682. As noted in footnote one, *supra*, Malcom did not specifically dedicate an issue to the affidavit. Instead, he commingled the argument with other another issue.

Following closing arguments at the hearing, the parties debated whether the affidavit constituted sufficient evidence to support issuance of a temporary injunction. Malcom made a hearsay objection and asked that the affidavit be excluded. The trial court noted Malcom's objection and announced the following:

> I'll make some reference in my ruling to whether or not I considered [the affidavit] or whether or not I sustained your objection.

The temporary injunction is silent on whether the trial court ruled on the hearsay objection or whether it considered the affidavit. Malcom concedes "the Court failed to do so." But in this court, he argues that the affidavit is conclusory and then suggests "it is presumable that the Court <u>did</u> in fact, consider this affidavit as evidence, and such was an abuse of discretion."

First, Appellant's hearsay objection in the trial court does not comport with his argument on appeal that the affidavit is conclusory. The differing theories result in waiver of the issue. *See Jem Int'l, Inc. v. Warner Props.*, *L.P.*, No. 07-17-00042-CV, 2018 Tex. App. LEXIS 7764, at *9 (Tex. App.—Amarillo Sept. 24, 2018, no pet.) (mem. op.) (citing *Knapp v. Wilson N. Jones Mem'l Hosp.*, 283 S.W.3d 163, 170 (Tex. App.—Dallas 2009, no pet.)). Second, there is nothing in the record to indicate the trial court ruled on

11

Malcom's hearsay objection, even implicitly. *See* TEX. R. APP. P. 33.1(a)(2). *See also In re R.A.W.*, 07-13-00316-CV, 2015 Tex. App. LEXIS 3039, at *12 (Tex. App.—Amarillo March 27, 2015, no pet.) (mem. op.). Without obtaining a ruling, Malcom has again forfeited his complaint.

#### PRESERVATION OF ERROR ON SPECIFICITY OF THE TEMPORARY INJUNCTION

One of Malcom's complaints is that the *Temporary Injunction* fails to comply with the requirements of Rule 683 of the Texas Rules of Civil Procedure. Cobra responds that Malcom failed to preserve his complaint by not first raising it in the trial court. While we agree with Cobra that Malcom failed to preserve the issue, the path to that conclusion is not without controversy.

Rule 683 provides in pertinent part that an order granting an injunction "shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other documents, the act or acts sought to be restrained . . . ." TEX. R. CIV. P. 683. In the underlying case, the *Temporary Injunction* recites the trial court's findings as follows:

1. Plaintiff and Defendant (the "Parties") entered into an agreement for the purchase by Plaintiff of Higher Power Electrical, LLC (the "Company"), from Defendant dated April 21, 2017 (the Purchase Agreement);

2. Defendant worked as President of the Company following consummation of the transaction contemplated in the Purchase Agreement until his resignation on October 13, 2018;

3. Defendant went to work for BHI Energy in approximately February 2019;

4. BHI Energy is engaged, inter alia, in the Company Business as defined by the Purchase Agreement, including in the Territory (Texas, New Mexico and Oklahoma) as defined by the Purchase Agreement;

5. AEP is an investor owned utility (IOU) as defined in the Purchase Agreement operating in the Territory as defined by the Purchase Agreement;

6. Defendant engaged in the Company Business or assisted BHI in engaging in the Company Business in the Territory (Texas) when he reviewed documents and participated in email communications regarding BHI Energy work or proposed work for AEP in Texas;

7. Oklahoma Gas & Electric (OG&E) is an IOU as defined in the Purchase Agreement operating in the Territory as defined by the Purchase Agreement;

8. Defendant engaged in the Company Business or assisted BHI in engaging in the Company Business in the Territory (Oklahoma) when he participated in a meeting with OG&E officials and participated in email communications regarding BHI Energy work or proposed work for OG&E in Oklahoma;

9. Otero and Lea County Cooperatives, although not IOUs, are entities who are clients or customers of the Company.

10. To the extent the Purchase Agreement might be construed to prohibit Defendant from employment in the Company Business outside of the Territory, it [sic] overly broad.

11. There is evidence that Defendant engaged in other conduct that violated the terms of the Purchase Agreement; and

12. There exists a probable right of recovery by Plaintiff and a probable injury to Plaintiff.

As relevant here, the trial court then described the acts sought to be restrained as (1) engaging in the company business in Texas, New Mexico, and Oklahoma including work for Otero and Lea County Cooperatives which were clients of Higher Power, (2) soliciting, hiring, or encouraging any person employed by Higher Power, and (3) soliciting, contacting, enticing, or attempting to solicit or entice any clients or customers of Higher Power in Texas, New Mexico, or Oklahoma to divert their businesses from Higher Power.

Malcom contends the *Temporary Injunction* is unenforceable and should be dissolved because the provisions are not specific and detailed. Specifically, Malcom complains the trial court failed to issue a finding on the absence of an adequate legal remedy or the existence of an irreparable injury which cannot be adequately compensated in damages and that the "only indicia of any probable injury . . . is the conclusory statement appearing in finding number [12]."

A temporary injunction that fails to comply with the mandatory requirements of Rule 683 is void. *See Interfirst Bank San Felipe N.A. v. Paz Construction Co.*, 715 S.W.2d 640, 641 (Tex. 1986). Courts of appeals are split on whether a party can waive the right to complain of the failure of a temporary injunction to comply with Rule 683. *See Tex. Tech Univ. Health Scis. Ctr. v. Rao*, 105 S.W.3d 763, 768 (Tex. App.—Amarillo 2003, pet. dism'd).

Relying on *Paz Construction*, most appellate courts have held that a complaint of a trial court's failure to comply with Rule 683 is not waived on appeal. *See Indep. Capital Mgmt. L.L.C. v. Collins*, 261 S.W.3d 792, 795 n.1 (Tex. App.—Dallas 2008, no pet.); *EOG Res., Inc. v. Gutierrez*, 75 S.W.3d 50, 52-53 (Tex. App.—San Antonio 2002, no pet.) *Big D Properties, Inc. v. Foster*, 2 S.W.3d 21, 23 (Tex. App.—Fort Worth 1999, no pet.); *360 Degree Communications Co. v. Grundman*, 937 S.W.2d 574, 575 (Tex. App.—Texarkana 1996, no writ).

But the Third Court of Appeals and this court, expressing a minority view, have applied the principles of procedural default and have found that failure to make a trial objection to the form of the injunction waives the party's right to complain on appeal. *See*

14

*Taylor House Authority v. Shorts*, 549 S.W.3d 865, 880 (Tex. App.—Austin 2018, no pet.); *Emerson v. Fires Out, Inc.*, 735 S.W.2d 492, 493-94 (Tex. App.—Austin 1987, no writ); *Rao*, 105 S.W.3d at 768. *See also Hoist Liftruck Mfg. v. Carruth-Doggett, Inc.*, 485 S.W.3d 120, 127 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (citing *Rao*, 105 S.W.3d at 768 and explaining why error preservation rules "should apply with double force in expedited proceedings").

In *Rao*, the trial court made a finding that "Rao tendered evidence of imminent harm, irreparable injury and an inadequate legal remedy." 105 S.W.3d at 767. Texas Tech complained that the finding was conclusory and did not meet the requirements of specificity required by Rule 683. *Id.* Notwithstanding the conclusory nature of the trial court's findings, this court found that Texas Tech's complaint regarding Rule 683 had not been preserved. In addition, we reviewed the complaint and found the trial court's stated reasons in the temporary injunction were sufficient to comply with Rule 683. *See id.* at 768. *See also Pinebrook Props., Ltd. v. Brookhaven Lake Prop. Owners Ass'n*, 77 S.W.3d 487, 504-05 (Tex. App.—Texarkana 2002, pet. denied) (finding a recitation of the reasons that an injunction issued because the defendants had no adequate remedy at law, the rights involved were unique and irreplaceable, and money damages would not be a sufficient remedy were sufficient to meet the requirements of Rule 683).

Adhering to our precedent in *Rao*, we find that Malcom did not preserve his complaint that the *Temporary Injunction* was not specific enough. However, even if he had preserved the issue, his complaint that finding number 12 is conclusory for failing to include a finding on the absence of an adequate legal remedy or the existence of an irreparable injury is groundless. In its finding, the trial court recited that "a probable injury"

15

exists. Such a finding subsumes that the injury is irreparable and that there is an absence of an adequate legal remedy. *See Butnaru*, 84 S.W.3d at 204. Similar findings have been found sufficient to meet the specificity requirements of Rule 683. *See Rao*, 105 S.W.3d at 767 (citing *Pinebrook Props., Ltd.,* 77 S.W.3d at 504-05). Appellant's complaint regarding Rule 683 is overruled.

### TRIAL COURT'S FAILURE TO REFORM UNREASONABLE TERMS OF COVENANT OR DISSOLVE THE TEMPORARY INJUNCTION UNDER EQUITABLE PRINCIPLES

One of Malcom's issues is abuse of discretion by the trial court in failing to reform unreasonable terms of the non-competition covenant pursuant to section 15.51 of the Texas Covenant Not to Compete Act. *See* TEX. BUS. & COM. CODE ANN. § 15.50 - .52 (West 2011). Section 15.51, however, "applies only when the issue of enforceability of the covenant is finally determined and reformation is made as part of the final remedy." *See Primary Health Physicians*, *P.A. v. Wallace Sarver*, *D.O.*, 390 S.W.3d 662, 665 (Tex. App.—Dallas 2012, no pet.). An appeal from a ruling on a temporary injunction based on a non-competition covenant does not present for appellate review the definitive question of whether the covenant is enforceable under the Act. *Insgroup*, *Inc. v. Langley*, No. 14-18-01071-CV, 2020 Tex. App. LEXIS 2685, at *20 (Tex. App.—Houston [14th Dist.] April 7, 2020, no pet. h.) (mem. op.). Additionally, at this stage, we do not consider arguments aimed at the merits of the underlying breach of contract claim. *See Comed Med. Sys.*, *Co. v. AADCO Imaging*, *LLC*, No. 03-14-00593-CV, 2015 Tex. App. LEXIS 1762, at *11 (Tex. App.—Austin Feb. 25, 2015, no pet.) (mem. op.) (noting that "consistent with the purposes of a temporary injunction, an appeal of such an order does not present the merits of the underlying case for review . . . .").

16

In another issue, Malcom contends that equitable principles require dissolution of the *Temporary Injunction* because he is a mere individual challenging a corporate entity and the non-competition covenant is "facially unconscionable and overly broad." Again, Malcom invokes the Covenant Not to Compete Act. As previously noted, the Act does not apply until the enforceability of the covenant is finally determined. *See Insgroup, Inc.*, 2020 Tex. App. LEXIS 2685, at *20.

Ultimately, the only question before us in this interlocutory appeal is whether the trial court abused its discretion in issuing the *Temporary Injunction*. We will simultaneously consider Malcom's remaining issues challenging the trial court's discretion in issuing the *Temporary Injunction*.

### ANALYSIS

In his quest for dissolution of the *Temporary Injunction*, Malcom does not contest the first element—whether Cobra met its burden to plead and prove a cause of action against him. Nevertheless, we note that Cobra pleaded a breach of contract claim and presented evidence in support of its claim. As previously noted, when a temporary injunction is sought to enforce a restrictive covenant, the party seeking the injunction need only show that the defendant intends to commit an act that would breach the restrictive covenant. *See Letkeman*, 299 S.W.3d at 486.

The second and third elements that must be pleaded and proved are a probable right to recovery, i.e., a likelihood of success in the underlying suit, and a probable and irreparable injury which includes the absence of an adequate legal remedy. Through

17

testimony and numerous emails and exhibits, to be discussed herein, Cobra has satisfied its burden.

At the hearing on Cobra's petition for injunctive relief, testimony was presented by Mark Guess, its chief of operations officer, Max Wolford, a vice president at BHI, and Malcom. Mahan, Malcom's successor at Higher Power, disregarded a subpoena to appear and testify. Guess had only been employed by BHI since May 2018.

It is undisputed that BHI is a direct competitor of Higher Power. Guess testified he had reviewed the *Purchase Agreement* and was aware of the restrictive covenants agreed to by Malcom to not compete and to not solicit Higher Power's clients or employees. The *Employment Agreement* prohibited Malcom or any of his "affiliates"—a person under his control—from engaging or assisting others in engaging in "restricted business"—the business of servicing investor-owned utilities, including providing services to the oil and gas industry—in the territories of Texas, New Mexico, and Oklahoma.

Two of Higher Power's former clients included Otero and Lea County, both cooperatives and not IOUs. Guess testified that Higher Power lost those clients to BHI because of Malcom. During cross-examination, however, he was asked whether the decline in the price of Higher Power's stock as well as lost clients and contracts could have been attributable to the scandal involving its former president and his indictment for corruption during the hurricane recovery efforts in Puerto Rico. Guess answered that he was not familiar with what drives the stock market and added that he did not know the particulars of the corruption allegation.

The two agreements involved in the sale of Higher Power prohibited Malcom from directly hiring or soliciting any Higher Power employees during the two-year restricted period. On April 18, 2019, Malcom emailed Wolford and others recommending salaries for three employees of Higher Power once they became employees of BHI. Malcom also suggested hiring one of the employees as a journeyman instead of as a foreman. Tommy Strickland, general foreman for Higher Power, was one of the employees discussed in the email. Malcom made a recommendation on his salary at BHI in the position of foreman.

The evidence showed that Strickland worked for Higher Power until May 3, 2019. However, before leaving his position, he was part of an email chain dated April 26th and 27th, in which he engaged with the operations manager of Otero. Otero's operations manager asked Strickland to reschedule a meeting "to show up on the 8th" (presumably in May after Strickland went to work for BHI) "to get together on a price from BHI Energy before we can get started." Strickland then emailed Wolford at BHI advising him that Otero's operations manager wanted a price list. Wolford responded, "I'll get with [Malcom] to put things together." Malcom then emailed Wolford and Strickland asking Strickland to "get me the underground unit spreadsheet."

In another email chain, BHI's vice president of finance asked for confirmation of rates for new jobs. Some of the jobs listed included Lea County, Oklahoma Gas and Electric, and Texas New Mexico Power. Lea County was listed in Schedule 3.09(a) of the *Purchase Agreement* as a "material customer" of Higher Power that was unavailable to Malcom. The other two companies were located in the territory in which Malcom was prohibited from engaging in company business. The prohibition notwithstanding, Malcom

19

responded to the email that "the rates are good except for these" and pointed some of them out. As the email chain continued, Malcom eventually expressed his approval for the new job numbers.

In another email chain, Malcom was actively involved with another former client of Higher Power listed in Schedule 3.09(a) of the *Purchase Agreement*—West Texas AEP. Other email chains introduced into evidence showed that Malcom participated in discussions and scheduled meetings to discuss crews for Texas New Mexico Power and Oklahoma Gas and Electric, companies in the restricted territories.

Wolford testified he was hired by BHI on April 15, 2019, as operations manager for territories west of the Mississippi. He testified that Malcom was not involved in work in the restricted territories and instead was in charge of operations east of the Mississippi. Wolford also testified that BHI did not solicit Higher Power's clients. According to Wolford, Otero's operations manager was dissatisfied with Higher Power and reached out to him to make a change. He also testified that he was the one who offered Strickland and his crews positions at BHI. According to Wolford, it was common in the industry for crews to follow their superintendents or foremen and that Malcom had not been involved in soliciting Higher Power's employees.

Regarding the numerous emails, Wolford claimed that it was very common to send them to a "wide list of people" who may not be involved with the subject of the email. He denied any knowledge of why Strickland and Malcom might have been communicating by emails concerning price lists.

During cross-examination, Wolford testified he was not an "affiliate" of Malcom's and that Malcom had no control over him or over operations in Texas, New Mexico, or Oklahoma. They were equals at BHI—he managed the territory west of the Mississippi and Malcom managed operations east of the Mississippi.

Malcom testified he did not hire Strickland or any crews from Higher Power. He claimed that Wolford hired Strickland and echoed Wolford's testimony that crews follow their foremen. He claimed he was simply included in many email chains as a part of the company practices; however, he was not involved in any company business in the restricted territories. He was adamant that his role with BHI in servicing clients in the restricted territory was purely administrative. He denied being involved in any negotiations that would violate the restrictive covenants and claimed that his participation in emails involving pricing was "post pricing" after agreements had already been reached.

When questioned about certain emails involving Strickland and other Higher Power employees, he explained that he sent those emails for Wolford because Wolford did not yet have his company computer. He also explained that he was involved in many emails with other businesses because his opinion was often sought given his experience and reputation in the business. He denied approaching any of Higher Power's clients and speculated that Strickland probably influenced Otero into leaving Higher Power and becoming a client of BHI.

Malcom testified he left Higher Power before the three-year transition period expired because he was dissatisfied with the company. He had been notified by a co-worker of a sexual harassment claim against Cobra's then-president and he was

21

frustrated by the operations in Puerto Rico.  He also heard that Mahan was going to replace him as president and he would be moved to sales.

The trial court was confronted with conflicting testimony.  However, the numerous emails either sent or received by Malcom, on their face, appear to directly violate some of the restrictive covenants to which he had agreed.  For the most part, Malcom was not a passive recipient of the email chains.  The emails showed that Malcom had more than a passive involvement with hiring decisions concerning former Higher Power employees.  They also showed that job numbers depended on his approval and that he was involved in meetings with companies in the restricted territories.  Contrary to his testimony, the emails showed his participation to be more than solely in an administrative capacity.  There is evidence that Malcom intended to commit acts in breach of the restrictive covenants to which he had agreed.  Viewing the evidence in the light most favorable to the trial court's ruling and deferring to the trial court's role as fact finder, we find no abuse of discretion in the issuance of the *Temporary Injunction.*  Malcom's remaining issues are overruled.

### CONCLUSION

Having overruled or otherwise disposed of all of Malcom's issues, the trial court's *Temporary Injunction* is affirmed.

Patrick A. Pirtle
Justice

22